(5 App. Div. 609)

## McINTYRE v. JOURNAL CO.

(Supreme Court, General Term, Third Department. May, 1896.)

LIBEL AND SLANDER—LIBELOUS PUBLICATION.

    A newspaper article stated that the Albany County Penitentiary was a gold mine, which furnished a corruption fund for the use of a certain political party, and that that fact explained why they "fought so desperately" to retain plaintiff, who was superintendent of the penitentiary, in office; that such party had used the power of the court for iniquitous purposes, and that it would not be strange if they should do it again; that the reports of the penitentiary showed that there was "juggling with the accounts"; that it was generally believed that plaintiff was a rich man, though he was not so when he went into office; and it concluded by stating that "the whole prison system is rotten to the core." *Held*, that such publication was libelous, as charging plaintiff with maladministering his office for unlawful purposes.

Appeal from special term, Rensselaer county.

Action by James McIntyre against the Journal Company for libel. From an interlocutory judgment overruling a demurrer to the complaint on the ground that it did not state facts sufficient to constitute a cause of action, defendant appeals. Affirmed.

    The complaint alleged that plaintiff for several years had been the superintendent of the Albany County Penitentiary, the convicts in which were hired out under contracts made by plaintiff, as such superintendent, for the benefit of the county; and that plaintiff received the money under such contracts, and was required by law to deposit with the treasurer of the county the balance remaining after paying certain expenses. The complaint also set out the alleged libelous article, which, after stating resolutions of the penitentiary commissioners directing a transfer to the credit of the county of $70,000 from the earnings of the penitentiary, was as follows:

    "For years the Journal has contended that the Albany Penitentiary was a gold mine that furnished the sinews of war and the corruption fund which the local Democracy has used to debauch the electors of this town. This explains why they fought so desperately to retain James McIntyre in office,

for the removal of their creature from the superintendency of the institution means that they will be deprived of the means which caused them to buy so many. elections. They are so desperate over this prospect that the public would not be surprised if they should resort to other measures to prolong their hold on the penitentiary. Before this, they have used the power of the court for iniquitous purposes, and it would not be strange if they should do it again. The figures contained in the above resolution are highly significant, and the question naturally arises, how does it come to pass that the penitentiary commissioners are able, in the spring of 1895, to turn over $70,000, when, in 1894, only a surplus of $27,000 was reported? Has the surplus ever before exceeded $30,000? In view of existing conditions, these inquiries are pertinent, and may lead to an examination which will show conclusively why the desperate ringsters are so unwilling to give up their hold on this building. The Journal has contended time and again that there was juggling with the accounts of the prison. This seems to be indicated in the reports of the years 1875 and 1894. In these two years the number of prisoners in the penitentiary was the same. Yet in 1875, when high prices were the rule, it cost only $75,000 to maintain the prisoners, and $28,000 was turned in to the county. In 1894, with prices down to bed rock, it cost $100,000 to maintain the same number of prisoners, and only a surplus of $27,000 was reported. These figures indicate that somebody was making a good thing out of the penitentiary, and it was not the taxpayers of Albany county either. It is generally believed that Superintendent McIntyre is a rich man, though, when he went into office, he was not burdened with an over-supply of this world's goods. Did he make this money out of his salary? If he made it out of the proceeds of the work of prisoners, he has done an illegal thing. The fact is, the whole prison system is rotten to the core, and to prevent shameful revelations, and at the same time retain hold of the means that has provided a great corruption fund, there is reason to believe that the ringsters will make a further fight."

Argued before PARKER, P. J., and LANDON, PUTNAM, and MERWIN, JJ.

Arthur L. Andrews, for appellant.
James W. Eaton, for respondent.

PER CURIAM. Construing this article as we think it would be understood by people generally (Turton v. Recorder Co., 144 N. Y. 144, 38 N. E. 1009), we have no doubt that it is libelous. It charges the plaintiff, in substance and effect, with maladministering his office in the past for unlawful purposes, and with being such a corrupt character that he is ready and willing to repeat and continue the like maladministration, and so facile an instrument in the hands of certain "ringsters" that he is willing to prostitute his office to subserve their unlawful purposes. We consider the article as a whole. It is so written as to leave the impression upon the mind of the reader that the plaintiff has been, and still is, an officer who has criminally abused, and is willing to continue to abuse criminally, his very responsible office.

The interlocutory judgment is affirmed, with costs, with the usual leave to the defendant to answer upon payment of costs in this court and below.